# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBOCAST, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | Civil Action No. 11-235 (RGA) |
| v. | ) | |
| APPLE, INC., | ) | |
|     Defendant. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ROBOCAST, INC., | ) | |
|     Plaintiff, | ) | Civil Action No. 10-1055 (RGA) |
| v. | ) | |
| MICROSOFT CORPORATION, | ) | |
|     Defendant. | ) | |

## SPECIAL MASTER OPINION AND ORDER

Paul M. Lukoff (Del. Bar #96)
Wilks Lukoff & Bracegirdle, LLC
1300 Grant Avenue
Suite 100
Wilmington, DE 19806
(302) 225-0850

Dated: July 19, 2013

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBOCAST, INC., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 11-235 (RGA) |
| v. | ) | |
| | ) | |
| APPLE, INC., | ) | |
| Defendant. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ROBOCAST, INC., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 10-1055 (RGA) |
| v. | ) | |
| | ) | |
| MICROSOFT CORPORATION, | ) | |
| Defendant. | ) | |

## SPECIAL MASTER'S OPINION AND ORDER

This Opinion and Order in these related patent infringement cases deals with the parties' dispute No. 1, pertaining to the plaintiff's Privilege Log. Some briefing on this issue had occurred before my involvement. A hearing was held on June 24, 2013 and I have received some further, post-hearing submissions. However, my consideration of this particular dispute has been delayed pending resolution of the parties' other disputes[1] including the most recent one which had to be resolved on an expedited basis. By the same token, the delay causes me to

---

[1] Disputes No. 2, No. 3 and No. 4 (as delineated in my Opinion and Order dated June 28, 2013) each resulted in an Opinion and Order, dated July 3, 2013, June 28, 2013 and July 8, 2013 respectively.

bifurcate the opinions by which I resolve the Privilege Log issues presented. This Opinion and Order, while generically describing below the other questions for resolution, deals only with the dispute over so-called third party consultants and the impact of their presence on what might otherwise be privileged communications.

One preliminary question is: precisely which documents are at issue? Each side has taken a different approach to that question. The plaintiff contends that the only issue before me is whether approximately 1,500 documents, involving third-party consultants, must be produced. It provided those documents to me in ten binders for an *in camera* review. Apple takes the position, however, that approximately 1,000-1,500[2] additional documents listed on the Privilege Log[3] are also contested, for various reasons including, e.g., Apple's contention that Robocast's Log does not describe them in sufficient detail to permit defendant to discern the basis for protection and, therefore, that, Robocast may not withhold such documents.

Apple also asks that I enforce Judge Andrews' April 17, 2013 Order by compelling the plaintiff to produce all Privilege Log-listed "Pozner documents." Michael Pozner, a Canadian- but not American-licensed attorney, functioned as Robocast's Director of Business Development in New York, despite being described by the plaintiff as its "General Counsel." The Court's Order determined the latter title provided no relief to Robocast in terms of whether his advice constituted "legal advice." Consequently, the Court held that communications between Pozner and the plaintiff were not protected by the attorney-client privilege.

Robocast has produced some, but not all, Pozner documents. Its theory for continuing to withhold the remainder is that Pozner's status as a lawyer unlicensed in the U.S. should not

---

[2] Which have also been provided to me by the plaintiff for *in camera* inspection.

[3] The Log is comprised of approximately 15,000 document references.

2

control whether certain documents, otherwise privileged, are still protected. For example, if he was a participant, just like another non-attorney high level employee of Robocast, in written communications seeking legal advice from counsel, why should that communication not still be privileged?

My resolution of the parties' disputes over (i) the Pozner documents, and (ii) documents Apple claims have not been sufficiently described on the Privilege Log, will occur in a subsequent opinion.

As to the first 1,500 documents and the third party consultant issue, I see the preliminary question I posed as inviting Rule 26(b)(5)(A)[4] scrutiny, i.e., has the plaintiff sufficiently complied with that Rule and, if not, has plaintiff waived its claim of attorney-client privilege by reason of its non-compliance regarding these additional documents? That is, notwithstanding Robocast's position that only a generic, narrow issue is before me for consideration, a threshold issue with regard to <u>any</u> privilege log contest is whether the party which invokes protection has complied with the requirements of Rule 26(b)(5)(A). That threshold issue is implicit in the presentation of all privilege logs. As a result, I have an obligation to confirm that each document in plaintiff's Privilege Log passes muster under Rule 26(b)(5)(A).

Robocast believes that it should always have an opportunity to further revise its description of an inadequately described document; however, the plaintiff has previously been confronted on a number of occasions with informal requests by Apple to provide what the defendant believes are the bare minimum elements for an effective privilege log. In fact, I've

---

[4] FRCP 26(b)(5): "Claiming Privilege or Protecting Trial-Preparation Materials. (A) Information Withheld. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

3

been provided with various iterations of the plaintiff's Privilege Log, each succeeding version with certain enhancements or supplements, presumably created in order to at least address Apple's concerns if not some other reason. Given the evolution of the Log, either the current version of the Log suffices to withstand Apple's challenge in terms of basic Rule 26(b)(5)(A) compliance or it doesn't.[5]

Rule 26(b)(5)(A)(ii) has been construed as follows:

- The proponent of the privilege log must deliver a sufficiently-detailed description of each document such that the court can determine whether the elements of attorney-client privilege have been established. "Failing this, the documents must be produced." *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 475 (E.D. Pa. 2005)[citing an earlier decision in related litigation, *SmithKline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 534 (N.D. Ill. 2000)].

- The party claiming the privilege carries the burden of describing "the nature of the documents...in a manner that...will enable other parties to assess the applicability of the privilege or protection." *Chao v. Koresko*, 2005 WL 2521886, at *4 (3d Cir. 2005).

Relying on these precepts, I have determined on a document-by-document basis on the attached chart whether the plaintiff has met its description burden so as to allow an analysis of the document rather than having effectively waived any privilege that might otherwise be present.

Robocast argues that a broad brush can be applied to the documents that it asserts are at issue and that, to the extent a third-party consultant was not literally an employee of that company when he or she received the subject communication, that non-employment status

---

[5] The plaintiff has cited a few Delaware cases which it contends stand for the proposition that the privilege proponent must always be given further opportunity, in the face of a Rule 26(b)(5)(A) challenge, to take another stab at an adequate description. But in one of those cases, *Willemijn Houdstermaatschaapiji BV v. Apollo Computer, Inc.*, 707 F.Supp. 1429, 1443-4 (D.Del. 1989), Judge Roth, in fact, did not permit the plaintiff "to embellish insufficient descriptions" since doing so would "encourage dilatory discovery practices" even when she acknowledged that if she had permitted augmentation to the suspect descriptions, the documents "would probably be found to be privileged." None of the other cases unequivocally stand for the proposition being asserted. How many opportunities does the proponent get to try again? The logic of the plaintiff's position is that the opportunities are endless, but that seems an illogical concept. In any event, I have found very few descriptions that violate Rule 26(b)(5)(A).

should not be dispositive; rather, it asks me to consider the functional conduct of various individuals on behalf of the plaintiff. Apple contends that a waiver of the privilege has occurred because, to the extent that a presumptively-privileged communication was shared with a non-employee, the communication is no longer privileged.

Judge Andrews has effectively provided me with the fundamental parameters within which to conduct my analysis of the issues. He has already ruled that, since this is a patent case, the question of attorney-client privilege is governed by federal common law, under which the party seeking privilege protection bears the burden of showing its applicability. *Robocast, Inc. v. Apple, Inc.*, C.A. No. 11-235-RGA, (D.Del., April 17, 2013)[Order]. Consequently, when I look at federal common law cases regarding the attorney-client privilege issues presented here, I come away with the following specific insights that must inform my decision:

- The attorney-client privilege applies "(1) [w]here legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except [if] the protection [is] waived." *In re Bristol-Myers Squibb Securities Litig.*, 2003 WL 25962198, at *3 (D.N.J. 2003)[citing *U.S. v. Rockwell Int'l*, 897 F.2d 1255, 1264 (3d Cir. 1990)].

- "A party who discloses protected documents to third parties, or who cannot prove that communications were kept confidential, waives the right to assert the attorney-client protection." *Id.; SmithKline, supra* at 479 ["mass dissemination of purportedly confidential communications can destroy an assertion of the privilege"]; *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011){Chevron II}["If persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach."](citing *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007){where Judge Ambro cited the Restatement (3rd) of the Law Governing Lawyers § 68 (2000) and where he also cited prior Third Circuit precedent, *Westinghouse Elect. Corp. v. Rep. of the Philippines*, 957 F.2d 1414, 1426 n. 12 (3rd Cir. 1991), for the proposition that "[d]isclosing a communication to a third-party unquestionably waives the privilege."}).

- "[D]isclosure to a third party waives the attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011){Chevron I}[citing *Westinghouse Electric Corp., supra*, at 1428.]

- "When a client's ultimate goal is not legal advice, but rather, business advice, the attorney-client privilege is inapplicable." *In Re Bristol-Myers Squibb, supra*, at *5.

- Regarding the presence of business issues as well as legal issues in a communication, if "the ultimate decision then requires the exercise of business judgment and when what were relevant nonlegal consideration[s] incidental to the formulation of legal advice emerge as the business reasons for and against a course of action, those business reasons considered among executives are not privileged." *Union Pacific Res. Group, Inc. v. Pennzoil Co.*, 1997 U. S. Dist. LEXIS 24216 (D.Del. 1997)[citing *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 517 (D.Conn. 1976)]; *Phillips v. C.R. Bard, Inc.*, 2013 WL 1333790, at *7, *11 (D. Nev. 2013)["In order for a communication that pertains to both business and legal advice to be considered privileged, the 'primary purpose' must be to obtain or give legal advice."]

- Regarding third-party consultants and the functional-equivalent-of-an-employee concept, "[t]he key to deciding if a consultant should be protected under the 'functional equivalent' exception is if the consultant acts for the corporation and possesses the information needed by attorneys in rendering legal advice." *In re Bristol-Myers Squibb, supra* at *4.

*In re Bristol-Myers Squibb* has been described as representing an overly narrow view of how to determine the functional equivalence of an employee for attorney-client privilege purposes. *In re Flonase Antitrust Litigation*, 879 F. Supp. 2d 454, 458-9 (E.D. Pa. 2012)[6]. But, whether the so-called "narrow" approach of *In re Bristol-Myers Squibb* is used, or the so-called "broad practical" approach referenced in *In re Flonase* is applied, or if the functional equivalent concept isn't referenced at all, the end result must be consistent with Third Circuit precedent. However, no case has been cited to me, nor have I found one, where the Third Circuit has

---

[6] The court in *In Re Flonase* was faced with a situation where both parties, unlike here, had agreed that the "functional equivalent" test applied to the facts of that case, so the court went on to analyze the history of that test as part of the exercise in which it decided whether to adhere to the narrow or the broad view.

6

explicitly adopted the functional equivalent concept in any form, so we continue to have a possibly irreconcilable split between two of this Circuit's constituent districts[7].

I am comfortable with the notion that some functions of a relatively small company like Robocast might be best or necessarily accomplished through independent contractors and/or non-employee consultants. When, e.g., an independent contractor is only brought in for a discrete task that is clearly business-oriented and, on occasion, is involved in a consideration of matters where the company's attorneys are also involved, does the legal function trump the business function at least for those legal matters? The dividing line there for attorney-client privilege purposes may be quite hazy. And, the Third Circuit case law cited above reminds us that there is no discernible bright line to be followed when the privilege is assessed. That is, as the Court in *In re Flonase, supra* at 460, recognized, even if one adopts and then adheres to one interpretation of the functional equivalent test or the other[8], each individual document must be reviewed on a "case-by-case" basis to determine if it was created "for the purpose of providing or obtaining legal advice." Ultimately, as noted, it is the proponent of the privilege that bears the burden of establishing a sufficient basis for extending the privilege to such contractors and consultants.

There is an interesting and potentially anomalous circumstance in this case. An employee of the entity that owned Robocast (and who obviously functioned on behalf of both) appears in many documents on the Log. His title changed, however, over the course of time when the documents on the Privilege Log were created, from "Director, Business and Legal Affairs" to

---

[7] Which difference, whether irreconcilable or not, poses no obstacle for my purposes.

[8] I have not consciously followed either interpretation of the functional equivalent test. I don't believe it's necessary to adopt one or the other in order to resolve the various privilege questions that have been presented.

7

"Director, Operations and Business Development," or in the reverse direction. No matter his title, was he functioning in connection with any particular communication primarily for a legal purpose or primarily for a business purpose? That individual, Brett D. Smith, happened to be an attorney, but he obviously had non-legal responsibilities. I've tried to determine the capacity in which he was functioning from context.

It is appropriate at this point to briefly describe my understanding of the role of the various individuals whose status of "third-party consultant" or "independent contractor" is posited as the functional equivalent of a Robocast employee. The two non-employee individuals whose names are most prominently associated with the third party consultant documents on the Privilege Log are Kenneth Hicks and Bruce Barnet.

Kenneth Hicks was at all relevant times a partner and employee of the Farkouh, Furnan & Faccio LLP accounting firm[9]. He is an accountant. According to Mr. Torres, he was "my accountant" and had been since about 1990. In connection with Robocast, Mr. Hicks was on its "Professional Service Team." Given the number and type of documents on the Log with which he is associated, it's clear that Mr. Hicks devoted a significant portion of his time to Robocast matters and that he was privy to the highest level of confidential information. I am satisfied through a review of the documents that, for the most part, Mr. Hicks' involvement was integral to the solicitation, receipt and use of legal advice for Robocast[10].

---

[9] As was a name partner at his firm, Fred Farkouh, another individual whose name appears on some documents under review. Based on context, I see no reason to treat Farkouh differently than Hicks.

[10] As such, even from a "functional equivalent" test perspective, he generally performed the function of someone who could have been a Robocast employee but, due to the modest size of the plaintiff's operation personnel-wise, no such employee existed.

Bruce Barnet was "a leader in the publishing world," one of the "high level advisors" to Mr. Torres and Robocast and one of its investors. More significantly, he functioned, according to Mr. Torres, initially (at least in the post-receipt-of-patent time period) as Robocast's part-time CFO and then its Chairman of the Board, the latter officially beginning in the second half of 2010. However, it's evident that, before his official Chair status began, he was unofficially performing the same function. Mr. Barnet's name also appears on a large number of documents on the Log. It's difficult to separate, in terms of which specific days, months and years when he operated in the two "official" capacities. Those jobs have obvious functional utility vis-a-vis legal advice. However, if his presence related just to his publishing background, privilege doesn't follow.

The name of Kris Damon, an investor, fundraiser and the wife of a Robocast employee, appears on only eight documents. My review of the documents demonstrates that she was not critical to obtaining legal advice. Any of those documents distributed to her have lost any privilege.

Jeff Bellin was, according to Mr. Torres, for a time a part-time CFO for Robocast, but otherwise an investor, fundraiser and advisor. As with all other third-party consultants and independent contractors to whom otherwise privileged documents have been disseminated, I have tried to discern whether he was involved in connection with securing legal advice and, if so, whether his participation was "crucial"[11] or "nearly indispensable"[12] to that exercise. If it was, privilege has been retained; if not, the privilege is lost.

I could not find a legal advice-related role for Jeff Zilahy, a due diligence investigator.

---

[11] See p. 12.

[12] See p. 12.

It is difficult to envision Michael Stipkala, a "document manager," as such having much of a role with respect to legal issues, unless this involvement derived directly, in the sense that he, e.g., organized documents specifically in response to a request from an attorney. If it did, then the document remains privileged.

That Ajax Greene may have performed "finance-related, administrative" tasks for Robocast does not automatically qualify him as the type of individual who may have had responsibilities regarding legal issues but, if his work was critical in that connection, privilege has not been waived.

Timothy Simard, Tommy Burke, Pam Lippe and Charles Millard are all characterized by Mr. Torres as "trusted advisors,"[13] "key advisors" or the like, but just being characterized in that way does not necessarily demonstrate an important role with respect to obtaining legal advice for Robocast. For example, a number of members of Robocast's so-called "Advisory Board," touted to investors to encourage participation in funding opportunities, would not necessarily be deeply involved in the consideration of legal advice notwithstanding their credentials insofar as business matters were concerned. Timothy Simard, for example, was a potential investor. That he received certain documents certainly reflects Mr. Torres' proclivity to involve multiple people in connection with issues at least a portion of which raised legal questions. Robocast's privilege claims for documents distributed to Simard and these other "key advisors" have, in most circumstances, not stood up to scrutiny.

---

[13] A hot-off-the-presses opinion in *BSP Software, LLC v. Motio, Inc.*, 2013 WL 356870 (N.D.Ill. July 9, 2013), recently cited to me by Apple, demonstrates that (i) some courts, at least in another circuit, have not adopted the functional equivalent test, and (ii) to the judge who authored that opinion, a particular group of non-employee "trusted friends" who functioned as a "kitchen cabinet" would not qualify to be included within the scope of attorney-client privilege in the event that privileged information was shared with them. That some of Damon Torres' closest advisors may have been his "kitchen cabinet" is not dispositive of whether any of these individuals served an important and, by definition, functional role vis-à-vis securing legal advice for Robocast.

Joseph Russo, Mark Quinn and Richard Moore are all described as "computer programmers." As such, it's difficult seeing them, whether as employees or contractors, being significantly involved in legal matters except to the extent they functioned as intermediaries in some critical fashion between Robocast and its lawyers. If a document reflects that they were involved in the latter context, that document's privileged status will not have changed.

Wendy Arthur had trademark expertise. Eric Enge was involved with Robocast's business plans and Emily DellaMaggiara had some kind of patent litigation expertise. The presence of their names on Robocast documents (very few) has resulted in different assessments in terms of privilege as reflected on the decision chart.

Another individual whose name appears on more than a few documents is Eda Kapsis, an independent contractor involved with various business and funding projects. Ms. Kapsis was on board various communications from and to Robocast's lawyers over the many months during which she was negotiating a position as an independent contractor-provider of business related services. Robocast now[14] describes Ms. Kapsis as its "interim COO" for the year between December 2009 and December 2010. However, that seems inconsistent with the much smaller number of documents on which her name appears than, e.g., Mr. Barnet or Mr. Hicks, individuals whose roles were clearly integrated with legal advice to Robocast. Too, because Robocast was a small company at the time, placing a "COO" title on a part-time independent contractor seems make-weight, especially when you consider that, in his declaration describing the roles of various important high-level non-employee consultants, Mr. Torres did not identify Ms. Kapsis at all. However, when she was included in the dissemination and generation of

---

[14] In a July 16, 2013 letter to me from plaintiff's counsel in response to my request for information about certain individuals.

communications regarding certain issues which called for legal insights shows that her role was essential to the legal function, then the underlying document has retained its privileged status.

In the time periods before and during the creation of the documents I have reviewed, Robocast had both in-house and outside counsel who either knew about or could have been commissioned to analyze the risks of waiving the attorney-client privilege in connection with confidential communications at the highest level of secrecy but in the presence of third-party non-employees and/or independent contractors.

Had those attorneys, *sua sponte* or at Mr. Torres' request, inquired, they would have (with the client being situated in New York City) probably looked at either or both New York state cases and Southern District of New York case law. They would have found that, generally, voluntary disclosure of privileged communications to third parties waives the privilege unless a "narrow" agency exception can be utilized. But, successful use of the exception is predicated on not only establishing (i) that the client and the third party had a "sufficiently close" relationship that the client's subjective expectation of confidentiality was reasonable, *People v. Osorio*, 549 N.E.2d 1183 (N.Y.1989), but also (ii) that the disclosure was "necessary for the client to obtain informed legal advice" where the necessity element required the third-party's involvement to be "nearly indispensable" in facilitating the attorney-client communication. *National Educational Training Group, Inc. v. Skillsoft Corp.*, 1999 WL 378337 at *4 (S.D.N.Y. 1999); *Strongo v. BEA Associates*, 199 F.R.D. 515, 522 (S.D.N.Y.2001) [using the language "crucial to the lawyer's assessment of his client's case."].[15]

---

[15] The lawyers would have, of course, come across *In Re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y.2001) cited by the plaintiff, which case takes up the functional equivalent gauntlet thrown down by *In Re Bieter Co.* and runs with it.

New York federal courts create portions of federal common law. Since I am bound to apply federal common law, cases out of the Southern District of New York are a reliable source for me to consider. The perspective of the above-cited New York cases is consistent with that of the Third Circuit cases I quoted earlier. I have judged the privilege waiver issue from the same perspective and, whether or not I have found a waiver with respect to one or more third-party consultants or independent contractors, my rationale for making any such determination will not be founded on their status as an "outsider" or the "functional equivalent" of a Robocast employee, but rather on the individual's relative position with respect to obtaining legal advice.

I have created an obviously lengthy chart, attached to this Opinion at B, which is intended to resolve the pending dispute over privilege with respect to each challenged document pertaining to third-party consultants. From left to right, the first column notes the Privilege Log number of the document; the next column reflects whether the plaintiff has met its Rule 26(b)(5) description burden; the third column reflects whether the document is privileged or not (most of the claims being predicated on attorney-client privilege rather than work-product protection); the next two columns identify the independent contractor or third-party consultant involved and state whether the privilege, if it exists, has been consequently lost by virtue of the named individual's presence; and the last column shows any comments, also in abbreviated form, that I thought might help the litigants understand the basis for my decisions. A key to the use of decision chart abbreviations is provided at A.

Since the plaintiff has easy access to all documents on the Privilege Log, it should not be difficult for Robocast to produce to the defendants promptly any documents that I find to be

13

unprotected by privilege. Accordingly, the plaintiff must produce copies of all documents on its Privilege Log which, by virtue of this Opinion, are not privileged no later than July 24, 2013.

IT IS SO ORDERED.

_____
Paul M. Lukoff
Special Master

Dated: July 19, 2013