**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ROBOCAST, INC.,                              )
                                             )
            Plaintiff,                       )
                                             )   C.A. No. 11-235-RGA
      v.                                     )
                                             )   **PUBLIC VERSION**
APPLE INC.,                                  )
                                             )
            Defendant.                       )

**DEFENDANT APPLE INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO
EXCLUDE THE TESTIMONY OF ROBERT J. SHERWOOD AND
CREIGHTON G. HOFFMAN**

OF COUNSEL:

Harrison J. Frahn IV (*pro hac vice*)
Patrick E. King (*pro hac vice*)
Jason M. Bussey (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, CA 94304
Tel: (650) 251-5000
hfrahn@stblaw.com
pking@stblaw.com
jbussey@stblaw.com

Brian P. McCloskey (*pro hac vice*)
Gregory T. Chuebon (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3353
bmccloskey@stblaw.com
gchuebon@stblaw.com

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Apple Inc.*

Dated: November 1, 2013
Public Version Dated: November 8, 2013
1129486/36689

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF PROCEEDING ............................................................. 1

SUMMARY OF THE ARGUMENT ...................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

    I.     MR. HOFFMAN'S RELIANCE ON BERGER AND SHERWOOD.................. 2

          A.     Mr. Hoffman's Misplaced Reliance on Mr. Berger ..................... 3

          B.     Mr. Hoffman's Misplaced Reliance on Mr. Sherwood............................. 4

ARGUMENT .............................................................................................. 11

    II.    LEGAL STANDARD ........................................................................ 11

    III.   MR. SHERWOOD'S TESTIMONY MUST BE EXCLUDED ......................... 11

          A.     Mr. Sherwood's Testimony Does Not "Fit" The Facts............................ 11

          B.     Mr. Sherwood Relied on Unverified And Unreliable Data ..................... 13

          C.     Mr. Sherwood Misconstrues His Sources................................................ 15

          D.     Mr. Sherwood's Selection and Use of Data Is Unreliable ...................... 15

    IV.   MR. HOFFMAN'S TESTIMONY MUST BE EXCLUDED ............................ 16

          A.     Once Mr. Sherwood's Opinions Are Excluded, Mr. Hoffman Has
                No Basis For His iTunes Calculations ...................................................... 16

           B.     Even if Mr. Sherwood's Opinions Are Not Excluded, Mr. Hoffman
                Has No Support For His iTunes Calculations........................................... 17

          C.     Mr. Hoffman's Safari Analysis Must Be Excluded Because
                Mr. Berger's Report Has Been Withdrawn............................................... 18

          D.     Mr. Hoffman's Decision to Split Profits Equally Between Apple
                and Robocast Is Not Tied to the Facts of the Case .................................. 18

          E.     Mr. Hoffman's Analysis Violates the Entire Market Value Rule............. 19

    CONCLUSION............................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Atkinson v. Gen. Research of Elecs., Inc.*, No. 95 C 6708, 1998 WL
    812556 (N.D. Ill. Nov. 19, 1998) ............................................................................... 16-17

*Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor
Co.*, 435 F. App'x 430 (6th Cir. 2011) .......................................................................... 13

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) ................................................. 15

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ........................................................ 11

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ................................................................. 15

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870 (E.D.
Wis. 2010) ......................................................................................................................... 13

*In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10981,
    2010 WL 559108 (D. Mass. Feb. 12, 2010) ................................................................. 16

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ..................................................... 11

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999), *amended by* 199
F.3d 158 (3d Cir. 2000) ................................................................................................. 11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed.
Cir. 2012) ............................................................................................................ 12, 13, 19

*LeClercq v. Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979
    (N.D. Ill. Apr. 28, 2005) ................................................................................................. 16

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir.
2009) ................................................................................................................................ 19

*Mercedes-Benz USA, Inc. v. Coast Auto. Grp.*, 362 F. App'x 332
(3d Cir. 2010) ............................................................................................................ 16, 18

*Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440 (3d Cir.
2003) ................................................................................................................................ 14

*Network Prot. Sciences, LLC v. Fortinet, Inc.*, No. 12-01106, 2013
WL 5402089 (N.D. Cal. Sept. 26, 2013) ....................................................................... 20

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711
F.3d 1348 (Fed. Cir. 2013) ......................................................................................... 13, 14

*R&R Int'l, Inc. v. Manzen, LLC*, 09-60545, 2010 WL 3605234
(S.D. Fla. Sept. 12, 2010) ........................................................................ 14

*ResQNet.com,Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) .......................................... 11, 12

*Suffolk Techs. LLC v. AOL Inc.*, Case No. 1:12-cv-00625, Docket
Entry 518 (E.D. Va. Apr. 12, 2013) ........................................................ 19

*Uniloc USA, Inc. v Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir.
2011)........................................................................................................... passim

*United States v. Taylor*, 704 F. Supp. 2d 1192 (D.N.M. 2009) ................................................... 15

*ZF Meritor, LLC. v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)................................................. 14

**Statutes and Rules**

Fed. R. Evid. 702 .............................................................................................................. 11

## NATURE AND STAGE OF PROCEEDING

In this case, Plaintiff Robocast, Inc. ("Robocast") has accused defendant Apple Inc. ("Apple") of infringing U.S. Patent No. 7,155,451 (the "'451 Patent"). Fact discovery has concluded and trial is set for March 2014. Apple moves to exclude the testimony of Robocast's damages experts, Creighton G. Hoffman and Robert J. Sherwood.

## SUMMARY OF THE ARGUMENT

Creighton Hoffman, Robocast's damages expert, based his royalty analysis on two foundational opinions, one provided by James Berger and another supplied by Robert Sherwood. Mr. Berger's opinions were so indefensible that Robocast withdrew his report two business days after he was deposed and certified that it would not rely on him at trial. As a result, Mr. Hoffman concedes he is ███████████ damages relating to Apple's Safari web browser, which accounted for three-quarters of Robocast's damages case. Now, all that remains is Mr. Hoffman's iTunes analysis, which relies on Mr. Sherwood.

Although that analysis has many problems, two are paramount. First, to derive his royalty, Mr. Hoffman relies on Mr. Sherwood for opinions that Mr. Sherwood does *not* provide: Mr. Hoffman understood Mr. Sherwood to opine that Apple's use of the '451 Patent produced incremental revenues. But Mr. Sherwood says he has no opinions about the patent, the accused Apple products, or incremental revenues. Second, the opinions he does offer are irrelevant and unreliable. Mr. Sherwood opines that "automated browsing systems," which he defines far more broadly than the claims of the '451 Patent, increase click-through rates for ads that are unlike anything found in the accused products. To reach that conclusion, he consulted one source: Google.com, which yielded a handful of marketing documents where companies tout the effectiveness of their own ads, plus a few articles relating second-and-third-hand statistics. Mr. Sherwood's "analysis" consisted of accepting numbers he derived from these sources

1

without *any* investigation, throwing out the high and low, then averaging the rest. The numbers he cites, moreover, do not even appear in those documents, nearly all of which he badly misconstrues. For all of these reasons, his testimony must be excluded.

Mr. Hoffman relies exclusively on Mr. Sherwood for his iTunes royalty rate, and for this reason Mr. Hoffman's opinion also must be excluded. Mr. Hoffman makes two further independent methodological errors. First, he violates the entire market value rule by using as his royalty base *all* U.S. iTunes revenues, despite conceding that the vast majority of those revenues do not implicate the accused functionality. Second, he arbitrarily splits the proceeds of these sales between Robocast and Apple without providing any support for an equal division. Both errors provide additional bases to exclude his testimony.

## STATEMENT OF FACTS

### I.    MR. HOFFMAN'S RELIANCE ON BERGER AND SHERWOOD

Robocast accuses five functions in Apple's products of infringement: the Top Sites function in the Safari web browser; the Showcase and Flowcase functions of the iTunes Store; and the Parade and Flickr Screensaver functions in Apple TV. Creighton T. Hoffman, Robocast's damages expert, originally opined that reasonable royalty damages for all five functions total ██████████ *See* Ex. 1 (Hoffman Rpt.) at 8, 18, 23, Ex. C.[1] At his deposition on October 7, Mr. Hoffman produced corrected exhibits that reduced total damages to ████ ██████ Ex. 2 (Revised Exhibits) Supp. Ex. C; *see also* Ex. 6 (Hoffman Tr.) at 9:12-10:13. Mr. Hoffman attributes three-quarters of that amount ██████████ to Safari and the balance ██████████ to iTunes and the Parade function of Apple TV. Ex. 2 Supp. Ex. C. Mr. Hoffman offers no royalty for Flickr Screensaver. Ex. 6 at 120:4-25.

---

[1]    Unless otherwise indicated, all citations are to the Declaration of Jason M. Bussey, and all emphasis has been supplied.

### A.    Mr. Hoffman's Misplaced Reliance on Mr. Berger

Top Sites is one of the function in the Safari browser that displays thumbnail images of a user's most popular websites in a grid display.  *See* D.I. 304 (Menasce Decl.) ¶10. Mr. Hoffman's Safari damages model was based on the hypothesis that some percentage of users would stop using the browser if Top Sites no longer infringed.  Ex. 1 at 16-17.  ███████

███████████████████████████████████████████

███████████████████████████████

████████████████████████  *Id.* at 16.  To determine whether and, if so, the degree to which Safari usage (and thus search revenues) would decline absent infringement, Robocast retained another expert, James T. Berger, to conduct a consumer survey.  *Id.* Mr. Berger asked 987 consumers whether they would stop using Safari if Top Sites were replaced with what Mr. Berger understood to be a non-infringing alternative.  *See* Ex. 4 (Berger Rpt.) at 6-10.  Approximately 8.7% of Mr. Berger's survey participants responded that they "would not use Safari."  *Id.* at 10.  On this basis, Mr. Hoffman concluded that, but-for infringement, ████████████████████████████████████ Ex. 1 at 16-19, Exs. C-1, C-2.  Mr. Hoffman split this amount equally between Robocast and Apple, producing damages of █████████.  *Id.*

Mr. Berger's methodology was so flawed that, days after his deposition, Robocast declared it was "pulling the Berger report, and will not rely on it in any way at trial." Ex. 9 (Cohen email).  Among other things, Mr. Berger had no idea what Top Sites is—he thought it allows users to access ██████████████████(Ex. 7 (Berger Tr.) at 48:12-49:25); ████████████████████████████

████████████████████████████████

██████ (*id.* at 207:23-208:6); when asked on what basis he assumed his respondents were familiar

with Top Sites (which the survey did not define), he conceded █████████████████

████████████ (*id.* at 147:19-149:11); █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ (*id.* at 241:15-243:8; *id.* at 164:13-177:21); ████████████████████████

██████████████████████████████ (*id.* at 41:14-45:6; *id.* at 218:7-222:24).

Mr. Hoffman's only basis for calculating Safari damages is the withdrawn Berger survey.

*See* Ex. 6 at 171:10-172:5. Mr. Hoffman concedes in a proposed supplemental report that he is

████████████████████████████████████████████████████████████

████████████████████████ Ex. 3 (Supp. Hoffman Rpt.) at 2.[2]

### B.     Mr. Hoffman's Misplaced Reliance on Mr. Sherwood

The iTunes Store contains a rotating banner at the top of the main page called "Flowcase"

that displays artwork for various content. Before Flowcase was introduced, the iTunes Store

contained a similar banner known as "Showcase." D.I. 304 ¶7. The Parade feature of Apple TV

similarly provides an animation of cover art relating to content that can be purchased in iTunes.

*Id.* ¶9. Mr. Hoffman's damages model for iTunes is based on the hypothesis that the Showcase

and Flowcase banners attract a greater number of clicks—and, thus, purchases—because they

automatically rotate from one picture to another. Ex. 1 at 21-22. Although the accused Parade

animations cannot be "clicked," Mr. Hoffman includes Apple TV revenues in his iTunes

calculations without further analysis. *Id.* Ex. E; *see also* Ex. 6 at 103:13-104:19.

To quantify iTunes revenue derived from infringement, Mr. Hoffman relies on a third

expert, Robert J. Sherwood. Mr. Hoffman interprets Mr. Sherwood as opining that the

---

[2]      Apple is moving to strike that report because it untimely attempts to provide ██████████
████████████████████████████ regarding iTunes. *Id.* at 3.

4

██████████████████████████████████████████████ on Flowcase and

Showcase. Ex. 1 at 21. Mr. Hoffman also attributes to Mr. Sherwood the opinion that ████

███████████████████████████████████████████████ Thus, he

infers that because the incremental Showcase and Flowcase clicks represents ████ of *total*

iTunes *clicks* (*i.e.*, clicks not just on Flowcase and Showcase, but on any images that display

content), Apple's infringement is responsible for ████ of total iTunes *sales*. *Id.* at 21-22.

Mr. Hoffman therefore multiplies total iTunes revenues of ██████ by ████ deducts

incremental costs, then splits the resulting number between the parties, resulting in damages of

████████. *Id.* at 21-23; Ex. 2 Supp. Exs. C-3, C-4 (revised numbers).

   Mr. Sherwood does not actually offer any of the opinions that Mr. Hoffman attributes to

him. His opinion is that "ABS"—*not* the "infringing functionality"—increases click-through

rates.[3] Ex. 5 (Sherwood Rpt.) at 4. Mr. Sherwood defines "ABS" as "the automated

presentation of multiple items of web/internet content." *Id.* at 3. When asked, ███████████

█████████████████████████████████ he admitted █████ Ex. 8

(Sherwood Tr.) at 112:4-115:12. And when asked ████████████████████████

██████████████ he again confirmed, ████ *Id.* In reality, "ABS" is far broader than Claim

No. 37, the only relevant independent claim. For example, Mr. Sherwood testified that an ad

could be ABS ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ Thus, his definition disregards the "without

requiring user input," "during an overlapping time period," and "spanned concurrently"

limitations of Claim No. 37.

---

[3]   A "click-through rate" is the percentage of impressions (or exposures) to an ad that elicit
      a user's click. Ex. 5 at 3 n.1.

Mr. Sherwood also did not opine that: (i) clicks on Showcase or Flowcase increased by any amount, or (ii) any incremental clicks produced incremental sales.  Regarding the first point, he testified that his ███████████████████████████████████████ ████████████████████████████ *Id.* at 113:9-115:5; *see also id.* at 115:6-12 ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████

Regarding the second point, his report says he is "*unable* to confirm a change in a sales conversion *rate* for ABS."  Ex. 5 at 4.  He testified that it is also █████████████████that extra clicks led to an absolute increase in sales.  Ex. 8 at 130:18-132:19.

### 1.    Mr. Sherwood's Data Sources

To find support for the conclusions he does offer, Mr. Sherwood █████████████ ███████████████ (*id.* at 86:19-87:13), which he claims yielded 11 data points (Ex. 5 at 4 n.2). ██████████████████████████████████(Ex. 8 at 157:12-159:4; 156:10-12; 242:14-245:5), ████████████████████████(*id.* at 185:13-189:21). Ultimately, he was left with five sources, each discussed below:

The first source is a webpage maintained by Morf Media, a "gamification" company that creates "3D virtual gaming worlds for global brands."  Ex. 10 (Sherwood Depo. Ex. 2) at 165. Gamification, according to the webpage, "uses the same criteria that entice people to play games and applies those rules to everyday, non-game scenarios."  *Id.*  Under the heading, "*Join The Gaming Revolution*," the website boasts that "data" show a "68% rise in click through rates" when gamification is used, according to unidentified "industry experts" and "The Guardian."  *Id.* Mr. Sherwood adopts the 68% number.  Ex. 5 at 12 & n.17; Ex. 8 at 245:11-16.  ███████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████



*Id.* at 252:1-253:12 (objections omitted).  Morf Media presents the 68% figure as part of a sales

pitch for its own "gamification" products. Ex. 10 at 165. ████████████████████

████████████████████ (*id.* at 248:8-10)—

████████████████████ (*id.* at 245:17-247:6; 248:23-249:3).

Mr. Sherwood's second source is a press release from "SteelHouse," an online

advertising company, which touts its "stunning" new "A2" ad format.  Ex. 10 at 27; Ex. 5 at 12

& n.18; Ex. 8 at 253:18-254:12.  The document says A2 ads "drove 21% click-through rates."

Ex. 10 at 27. 

████████████████████

█████████████ *Id.* at 256:24-274:1; *id.* at 254:13-257:4. ██████████

████████████████████

████████████████████

███████████████ *Id.* at 257:5-259:2. ████████

████████████████████ *Id.* at

259:19-23. ████████████████████████████████████████████████

████████████████████████████████████████ *Id.* 259:4-262:17.

    The third source is a webpage maintained by "TLV Media" that describes "premium formats for online publishers," including ads that "slide[] from either the bottom, top, right or left hand side of the page and remain[] constant at [their] original size upon page scroll up and down." Ex. 10 at 25. TLV claims these slider ads are "highly effective," and that they "typically generat[e] 42% more ***eCPM*** than standard same size ads." *Id.* Mr. Sherwood misreads this document, too, claiming it reports "a 42% increase in ***CTR.***" Ex. 5 at 11. At his deposition, he testified that ████████████████████████████████████████████████ ████████████████████ Ex. 8 at 173:21-24. ████████████████████ ████████████████████████████████████████ *Id.* at 173:25- 175:9; *see also id.* at 171:17-173:20. Here ████████████████████████ ████████████████████████████████████████████████████████████ *Id.* at 170:5-182:21. ████████████████████████████████████ ████████████████████ *Id.* at 178:17-180:9.

    Mr. Sherwood's fourth source is an article titled "*Beyond the Banner,*" which contains the following sentence: "Eyeblaster claims interaction rates of up to 25% for certain rich-media ad formats in some markets." Ex. 10 at 6. Although the sentence refers to "interaction rates" (not click-through rates), and it says those are "up to 25%" (not that they increased), Mr. Sherwood cites it for the proposition that "ABS showed a 25% ***increase*** in ***CTR.***" Ex. 5 at 11; Ex. 8 at 202:17-204:8. During his deposition, he admitted that ████████████████████ ████████████████████████████████████████████████ ████████████████████ *Id.* at 206:19-208:16. He also agreed that ████████████

8

██████████████████████████████████████████ *Id.* at 208:22-
209:4.  Asked to defend his interpretation, Mr. Sherwood testified that he ██████████
████████████████ *Id.* at 204:13-205:8; *see also* 202:17-208:16.  ████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████.  *Id.* at 210:12-217:1.

Mr. Sherwood cited the same article for another data point: that ABS ads produced a
"50% CTR increase" over "comparable static ads."  Ex. 5 at 12; Ex. 8 at 230:9-24.  The relevant
sentence actually (i) references interaction rates, not click through rates, (ii) claims a 47%
increase, not 50% (or 59%, as he incorrectly records in his report), and (iii) does not say the
comparable ads were static.  Ex 10 at 7.  █████████████████████████████
████████████████████████  Ex. 8 at 231:3-239:11.  █████████████████████
██████████████████████████████  *Id.* at 239:6-240:5.  Moreover, according
to the article, the ads in question addressed "smoking's effect on sexual performance" and used
"the advertising formats flop, droop and shrink, as the user rolled their cursor over them."  Ex.
10 at 7-8.  █████████████████████████████████████████████████
███████████████████████  *Id.* at 240:11-25.

Finally, Mr. Sherwood relies on a Microsoft study that found when "Rising Star" ad
formats were used, the number of participants who agreed with the statement: "This ad makes
me want to click on it" increased by 30%.  Ex. 10 at 10, 40-41; Ex. 5 at 11, 13.  ████████████
██████████████████████████████████  Ex. 8 at 197:19-202:8.  He also counted the
study's 30% data point several times, based on two mistakes.  █████████████████████
█████████████████████████  *Id.* at 185:10-19.  █████████████████████



*Id.* 189:8-21; *see also id.* at 185:21-189:7.  Second, he interpreted a

reference to two *sessions* in one of those articles as evidence there were two *studies*.  ▮▮▮

▮▮▮▮▮▮▮▮▮▮    *Id.* 191:23-192:17; *see also id.* at 186:21-191:22.

Whereas the study found "a 30% increase in the level of agreement with the statement:

'This ad makes me want to click on it'" (Ex. 10 at 40), Mr. Sherwood described it as having

found a 30% *increase* in click-through rates (Ex. 5 at 11).  When asked to explain the difference,

he testified: ▮▮▮▮▮▮▮▮▮▮▮▮▮Ex. 8 at 194:12-25.

Later, he admitted that the sentence ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ (*id.* at 195:2-11) ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.* at

196:18-197:17).  *See also id.* at 192:18-194:11.

### 2.    Mr. Sherwood's Analysis

To calculate his 33% figure, Mr. Sherwood takes his claimed 11 data points and averages

them.  Ex. 5 at 4 n.2.  He gives each data point equal weight, even though he did not know to

what extent they were derived from different sample sizes or methodologies.  *Id.*  He also

disregarded other data points, some of which reported *decreased* click-through rates due to ABS,

and some of which reported increased rates of up to 950%, on the ground that those results are

not "typical"—an opinion for which he offers no support.  Ex. 5 at 10; Ex. 8 at 220:4-221:19;

333:18-334:18. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *See* Ex. 8 at 305:16-307:10; *id.* at 130:8-17.

## ARGUMENT

## II.    LEGAL STANDARD

Expert testimony is admissible only if (i) it is based on sufficient facts or data; (ii) it is the product of reliable principles and methods; and (iii) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).  Rule 702 also bases admissibility on the "connection between the scientific research or test result . . .  and [the] particular disputed factual issues in the case," otherwise known as the requirement of "fit."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742-43 (3d Cir. 1994).  "[I]t is the burden of the party offering the expert scientific testimony to demonstrate reliability by a preponderance of the evidence." *In re TMI Litig.*, 193 F.3d 613, 705 (3d Cir. 1999), *amended by* 199 F.3d 158 (3d Cir. 2000).

## III.   MR. SHERWOOD'S TESTIMONY MUST BE EXCLUDED

### A.    Mr. Sherwood's Testimony Does Not "Fit" The Facts

To carry its burden on damages, a "patentee must sufficiently tie the expert testimony on damages to the facts of the case." *Uniloc USA, Inc. v Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (citing *Daubert*, 509 U.S. at 591).  In *Uniloc*, the Federal Circuit explained: "[t]he bottom line of *Kumho Tire* and *Joiner* is that one major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case." *Id.* at 1316.  The damages theory must have a proper "fit" because "[a]ny evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *Id.* (quoting *ResQNet.com,Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).

Here, Mr. Sherwood's opinions are entirely divorced from the facts of this case.

Mr. Sherwood concedes he is ████████████████████████ and is not

11

relating his conclusions to the accused products ███████ Thus, his opinion is that something *other* than the '451 Patent increases click-through rates for ads Apple does *not* display. Moreover, by ignoring key claim limitations, his definition of "ABS" reaches far beyond the asserted claims; if used as the basis for damages, it would necessarily "punish[] beyond the reach of the statute." *ResQNet*, 594 F.3d at 869. This evidence "simply [has] no place in this case." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012).

Another critical problem is that Mr. Sherwood relied on implementations of ABS that are *completely different* than the accused features. Apple's products incorporate simple carousels. ████████████████████████████████████(Ex. 8 at 291:9-22); he instead considered ads that implement "3D virtual gaming worlds," images that "flop, droop and shrink, as the user rolled their cursor over them," and "attention grabb[ing]" slider ads, which "stay[] constant on screen" as the user scrolls up or down. *Supra* at § I.B.1. From the fact (if it is a fact) that those types of ads increase click-through rates, it hardly follows that a basic carousel increases click-through rates, let alone by the same percentage—███████████████ Ex. 8 at 305:16-307:10; *see also id.* at 130:8-17; *id.* at 126:12-130:6. Saying "ABS" increases click-through rates 33% is like saying "medicine" improves longevity 33%. Just as the latter opinion would be useless in assessing the effectiveness of a *particular* drug, the former cannot help the factfinder evaluate *Apple's* products.

Nor is "ABS" the only disconnect. ██████████████████████ ████████████████████████████████████ ████████████████████████*Id.* at 115:20-116:3. But Mr. Sherwood did not rely on studies in which the subject ads resembled Apple's accused products in any of these particulars. That is, instead of considering displays for music or movies in online stores,

12

Mr. Sherwood based his opinions—to take just one example—on a public service ad displaying "smoking's effect on sexual performance." He makes no attempt to explain how such evidence could possibly relate to Apple's accused functions or this case.

No factfinder could base a royalty on testimony that its own proponent admits has nothing to do with the patent and does not relate "███" to the accused products. Mr. Sherwood's testimony must therefore be excluded. *See LaserDynamics*, 694 F.3d at 80 (excluding opinion based on licenses that did not involve asserted patent or accused technology).

**B.    Mr. Sherwood Relied on Unverified And Unreliable Data**

Mr. Sherwood's opinions must also be excluded because they are based on unreliable and unverified sources. The use of "suspect data as the base of an expert's testimony [is] proper grounds to exclude that testimony." *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010). So, too, is a failure to validate data. *See Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor Co.*, 435 F. App'x 430, 457 (6th Cir. 2011) ("[A]ny proper methodology would include . . . independent review and verification of the underlying data.").

The Federal Circuit applied these rules in *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), where an expert relied on a document he "found . . . off the internet" to project shipping volumes for an accused device. *Id.* at 1373. The defendant argued that, due to its unknown origins, the data within the document was unreliable. The Federal Circuit "disagree[d]" with the plaintiff's retort that "the source and reliability of data relied upon by an expert is otherwise immaterial." *Id.* "[W]hile an expert's data need not be admissible," nevertheless, that "data cannot be derived from a manifestly unreliable source." *Id.* Because the expert could not verify the data's accuracy, admitting his testimony was an abuse of discretion. *Id.* at 1374.

13

The Third Circuit considered similar facts in *ZF Meritor, LLC. v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), where an expert estimated profits using projections "without knowing the circumstances under which [the] projections were created or the assumptions on which they were based." *Id.* at 292. On appeal, the Third Circuit disagreed with the lower court's suggestion that the expert had "blindly accept[ed]" the data; he knew *some* facts about it, including that it was presented to the company's board of directors, which had "relied on [it] in making business decisions." *Id.* Exclusion was appropriate, however, because he did not know who created the projections or what methodology they used. *Id.* at 293.

Mr. Sherwood's analysis involves facts more extreme than either *Fairchild* or *Meritor*. As in *Fairchild*, Mr. Sherwood relied solely on documents he derived from the internet. But Mr. Sherwood's data points, unlike the document relied on in *Fairchild*, were facially unreliable: most came from marketing materials designed to sell products, not convey objective information. And while Mr. Sherwood, like the expert in *ZF Meritor*, knew nothing about the methodologies employed to generate his data points, Mr. Sherwood also relied on secondary and tertiary sources, some of which contained only a single relevant sentence; he performed no follow up to verify the credibility of those sources; and he does not know to what extent any of his statistics have been relied upon. Thus, he did "blindly accept" the data. For this reason as well, his testimony must be excluded. *See, e.g.*, *Fairchild*, 711 F.3d at 1373-74; *ZF Meritor*, 696 F.3d at 293; *see also R&R Int'l, Inc. v. Manzen, LLC*, 09-60545, 2010 WL 3605234, at *15 (S.D. Fla. Sept. 12, 2010) (excluding testimony of damages expert who "did not attempt to review the underlying data or verify the accuracy" of documents found online); *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448-49 (3d Cir. 2003) (affirming exclusion where expert "admitted that he did not know what the document was, who created it, or how it was created").

### C.     Mr. Sherwood Misconstrues His Sources

A third basis for excluding Mr. Sherwood's testimony is that his opinions lack factual support. "[A]n expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to a jury." *Elcock v. Kmart Corp.*, 233 F.3d 734, 754 (3d Cir. 2000) (internal quote omitted). Here, Mr. Sherwood's opinions are contradicted by his own evidence. Five of his six data points do not exist—at least not in the documents he cites. The TLV webpage, for example, does not reference a "42% increase in CTR"—it says ads generated 42% more eCPM, a distinct metric. Likewise, the Haymarket article did not discuss a "25% increase in CTR"—it says *interaction* rates, a different metric, were *as high as* 25%. An opinion built on non-existent data and derived from incorrect interpretations of source documents cannot be allowed before a jury. *See Elcock*, 233 F.3d at 755-56 (excluding expert whose "economic damages model relied on several empirical assumptions that were not supported by the record"); *United States v. Taylor*, 704 F. Supp. 2d 1192, 1201-02 (D.N.M. 2009) (excluding expert who "mischaracterizes as a 'study' something that is actually a one-page technical note" and "also misrepresents the underlying thesis of that note").

### D.     Mr. Sherwood's Selection and Use of Data Is Unreliable

A third reason to exclude Mr. Sherwood's testimony is his selective and unreliable use of data. When an expert cannot "adequately explain why he ignored certain facts and data, while accepting others," he has "'cherry-picked' the facts." *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001). Mr. Sherwood's Google searches uncovered some documents indicating ABS negatively impacts click-through rates and others reporting increases of nearly 1000%. His only basis for disregarding these numbers was that they were not "typical," a claim for which he offered no support. By excluding negative numbers, Mr. Sherwood eliminated any possibility of finding no benefit to ABS. And by limiting the data sources he relies on to a

narrow range, he guarantees the end result will fall within his "typical" range. In other words, he selected his data based on the conclusion he wanted to draw. *See, e.g.*, *LeClercq v. Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding testimony of expert who "cherry pick[ed] the facts he considered to render his opinion").

Mr. Sherwood's use of the data within his range is also indefensible. He averages the results of multiple studies to obtain a single estimate of effectiveness. To properly perform such a meta-analysis, one must weight each study appropriately. And, to do that, one must know, at a minimum, what methodologies were employed, how large each study was, and what specifically was studied. One cannot simply find statistics that appear to relate to similar subjects and average them. But that is precisely what Mr. Sherwood did. His analysis thus "flunks the *Daubert* test of reliability." *In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10981, 2010 WL 559108, at *1 (D. Mass. Feb. 12, 2010) (excluding testimony of expert who did not give "appropriate weight" to studies when performing meta-analysis).[4]

## IV.   MR. HOFFMAN'S TESTIMONY MUST BE EXCLUDED

### A.   Once Mr. Sherwood's Opinions Are Excluded, Mr. Hoffman Has No Basis For His iTunes Calculations

If one expert bases his opinions on the analysis of another expert, and that other expert's analysis is deemed unreliable, then neither expert can testify at trial. *See, e.g.*, *Mercedes-Benz USA, Inc. v. Coast Auto. Grp.*, 362 F. App'x 332, 335 (3d Cir. 2010) (affirming exclusion of expert's testimony where predicate expert was excluded). Mr. Hoffman is well aware of this rule. In *Atkinson v. Gen. Research of Elecs., Inc.*, No. 95 C 6708, 1998 WL 812556 (N.D. Ill.

---

[4]   Mr. Sherwood's report contains a brief section regarding costs-per-thousand clicks. Ex. 5 at 13-14. It is unclear whether those opinions are being offered in this case. *See* Ex. 8 at 309:2-8. To the extent they are being offered, they must be excluded for the same reasons as his other opinions. *See id* at 310:14-319:3.

Nov. 19, 1998), Mr. Hoffman based his damages opinions on the testimony of another expert,

Mr. Wilson, who had purported to value features of a scanner. *Id.* at *3-4.  After excluding that

predicate valuation, the district court concluded, "[t]hat in turn knocks out the portion of

Hoffman's . . . report that attempts to springboard from Wilson's now barred-opinions to a

damages figure." *Id.* at *4.  Mr. Hoffman's opinions were at that point "based on nonexistent

underpinnings," so "they too cannot be introduced into evidence." *Id.*



Here, Mr. Hoffman admits his iTunes royalty is ███████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 1 at 23.  He

undertook no independent investigation, and admitted, ██████████████████ Ex.

6 at 245:21-246:2; *id* ██████████████████████████████████████

████████████████████ Without Mr. Sherwood's opinions, Mr. Hoffman's iTunes

calculations will have "nonexistent underpinnings" in this case as well.

**B.     Even if Mr. Sherwood's Opinions Are Not Excluded, Mr. Hoffman Has No
           Support For His iTunes Calculations**

Even if Mr. Sherwood's opinions were not excluded, Mr. Hoffman's proposed testimony

regarding iTunes is improper.  A chasm separates Mr. Hoffman's opinions from

Mr. Sherwood's. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████ *See supra* at § I.B; *see also* Ex. 6 at 95:19-23 ████████████

████████████████████████████████████████████████████████████████

████████████████████████████ *id.* at 237:17-23 ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ In reality, Mr. Sherwood

offers none of these opinions. *See supra* at § I.B.  Robocast is therefore left with one expert who

says he is *not* drawing opinions about the asserted patent or the accused products, and another

expert who assumes—as the basis for his opinions—that his counterpart *is* offering those very

same conclusions.  In other words, even with Mr. Sherwood's opinions, Mr. Hoffman's iTunes

calculations have "nonexistent underpinnings."

### C.    Mr. Hoffman's Safari Analysis Must Be Excluded Because Mr. Berger's Report Has Been Withdrawn

Mr. Hoffman concedes he is ████████████████████████████████████

████████████████████████████████████████████ Ex. 3 at 2.

Thus, his testimony regarding Safari must be excluded. *Mercedes*, 362 F. App'x at 335.

### D.    Mr. Hoffman's Decision to Split Profits Equally Between Apple and Robocast Is Not Tied to the Facts of the Case

Mr. Hoffman's testimony must also be excluded because he arbitrarily split profits

attributable to the '451 Patent equally.  In *Uniloc*, the Federal Circuit abolished the 25-percent

rule, holding that the use of a default royalty split fails to "say anything about a particular

hypothetical negotiation or reasonable royalty involving any particular technology, industry, or

party." 632 F.3d at 1317.  Mr. Hoffman, who authored an article celebrating the decision (Ex.

11), ████████████████████████████████████████████████

██████████ Ex. 6 at 54:20-58:7.  He also testified that the ████████████████████

████████████████████████████████████ *Id.* at 55:23-56:1.

But Mr. Hoffman's method is susceptible to the same criticisms.  He opines ████████

████████████████████████████████████████████████ Ex. 1 at

22████████████████████████ (Ex. 6 at 126:7-127:6), ██████████

████████████████████████████████████ (*id.* at 127:7-15), ████████████

█████████████████████████████████████ (Ex. 1 at 21).  He even

testified that he █████████████████████████████████████████ Ex. 6

at 123:23-25.  Without any supporting evidence, Mr. Hoffman's equal division is just as

untethered to the facts of the case as a 25-percent split would have been, and it should be rejected

for the same reasons.  *See Suffolk Techs. LLC v. AOL Inc.*, Case No. 1:12-cv-00625, Docket

Entry 518, at *4-5 (E.D. Va. Apr. 12, 2013) (excluding opinion based on 50-50 split because it is

"indistinguishable from the 25% rule of thumb in issue in *Uniloc*").

Mr. Hoffman makes a half-hearted attempt to bolster his 50/50 split assumption by

███████████████████████████████████████████████████████████████

██████ Ex. 1 at 22.  But none of the factors he identifies provide a basis for an equal division.

Without a factually-supported starting point, Mr. Hoffman's "factors" have no point of reference

and his proposed division is invalid.  *See Uniloc*, 632 F.3d at 1317 ("Beginning from a

fundamentally flawed premise and adjusting it based on legitimate considerations specific to the

facts of the case nevertheless results in a fundamentally flawed conclusion.").

### E.      Mr. Hoffman's Analysis Violates the Entire Market Value Rule

"Where small elements of multi-component products are accused of infringement,

calculating a royalty on the entire product carries a considerable risk that the patentee will be

improperly compensated for non-infringing components of that product."  *LaserDynamics*, 694

F.3d at 67.  For this reason, royalties must normally "be based not on the entire product, but

instead on the smallest salable patent-practicing unit."  *Id.*  The exception to this rule applies

*only* where the patentee can prove that the "patent-related feature is *the* basis for customer

demand."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).

Here, Mr. Hoffman uses the total proceeds from U.S. iTunes purchases as his royalty base, despite conceding that: ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████ (*id.* at 267:4-268:2). He also acknowledged that iTunes was ████████████████████████████████████████████████ ████████ Ex. 1 at 6; *see also* Ex. 6 at 98:13-18.

Mr. Hoffman justifies a royalty base that ██████████████████████████ █████████████████████████ Ex. 6 at 273:20-25. But a plaintiff cannot circumvent the entire market value rule "simply by asserting a low enough royalty rate" to account for other sources of demand. *Uniloc*, 632 F.3d at 1320. ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████

Mr. Hoffman's reliance on the total proceeds from U.S. iTunes purchases through the iTunes Store will only serve to skew the damages horizon. During the damages period, Apple earned over ████████ in proceeds from U.S. iTunes purchases, the vast majority of which have no relation to the accused technology. Ex. 6 at 267:4-268:2. Where an expert admits that the accused features are not the sole drivers of demand, "[u]sing the accused products as a royalty base . . . raises the . . . specter of error and jury prejudice." *Network Prot. Sciences, LLC v. Fortinet, Inc.*, No. 12-01106, 2013 WL 5402089, at *8 (N.D. Cal. Sept. 26, 2013).

## CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court exclude the testimony of Messrs. Sherwood and Hoffman in its entirety.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Harrison J. Frahn IV
Patrick E. King
Jason M. Bussey
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, CA 94304
Tel: (650) 251-5000

Brian P. McCloskey
Gregory T. Chuebon
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3353

By:   _/s/ David E. Moore_____
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Bindu A. Palapura (#5370)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE 19801
        Tel: (302) 984-6000
        dmoore@potteranderson.com
        bpalapura@potteranderson.com

*Attorneys for Apple Inc.*

Dated: November 1, 2013
Public Version Dated: November 8, 2013

21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 8, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on November 8, 2013, the attached document was Electronically Mailed to the following person(s):

Thomas C. Grimm
Jeremy A. Tigan
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE  19801
tgrimm@mnat.com
jtigan@mnat.com

Steven J. Rizzi
Akiva Cohen
Ramy E. Hanna
Foley & Lardner LLP
90 Park Avenue
New York, NY  10016-1314
srizzi@foley.com
acohen@foley.com
rhanna@foley.com
robocast@foley.com

Richard S. Florsheim
Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI  53202-5306
rflorsheim@foley.com
robocast@foley.com

Victor de Gyarfas
Foley & Lardner LLP
555 S. Flower Street, Suite 3500
Los Angeles, CA  90071-2411
vdegyarfas@foley.com

By:   /s/ David E. Moore
Richard L. Horwitz
David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com